**Affirmed and Memorandum Opinion on Remand filed on November 8, 2011.**



In The

# Fourteenth Court of Appeals

### NO. 14-09-00192-CR

### CHRISTOPHER CONNLEY DAVIS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 230th District Court
Harris County, Texas
Trial Court Cause No. 1170856**

## M E M O R A N D U M   O P I N I O N   O N   R E M A N D

This appeal arises from appellant Christopher Connley Davis's conviction for aggravated robbery and comes to us on remand from the Court of Criminal Appeals of Texas. *See Davis v. State*, No. PD-1400-10, 2011 WL 1135373, at *1 (Tex. Crim. App. March 30, 2011).

In the original appeal to this court, appellant argued that the trial court erred by (1) "refusing a proper question on jury voir dire," which the trial court determined to be an improper commitment question; and (2) allowing the State to introduce evidence of (a) another aggravated robbery, (b) appellant's participation in the spray-painting of graffiti

depicting gang symbols, (c) appellant's poor grades in high school, (d) appellant's school disciplinary records, and (e) appellant's jail disciplinary record. *Davis v. State*, 315 S.W.3d 908, 912-13 (Tex. App.—Houston [14th Dist.] 2010), *rev'd*, No. PD-1400-10, 2011 WL 1135373 (Tex. Crim. App. March 30, 2011). We affirmed. *Id.* at 920.

Appellant filed a petition for discretionary review in the Court of Criminal Appeals of Texas, contending that this court "erred in holding that his voir dire question was an improper commitment question." *Davis*, 2011 WL 1135373, at *1. The Court of Criminal Appeals held that this court "erred in determining that the appellant's question was a commitment question" and remanded the case to this court for further proceedings. *Id.* at *2.

## Facts

Around 11:30 p.m. on April 20, 2008, complainant Jonathan Diaz went to a nearby store to purchase diapers for his daughter. When he returned to his apartment complex, the complainant felt uneasy when he noticed a man sitting in the bushes. Complainant observed the man in his rear view mirror getting out of the bushes and then walking past the passenger side of complainant's vehicle. As the complainant exited his car, the man stopped walking, turned around, reached under his shirt, pulled out a gun, and pointed it at the complainant. The complainant heard the gunman cock his gun and state, "You know what this is. Give me what you got." The complainant gave the gunman his money clip, cell phone, and keys. The gunman asked the complainant for cash, but the complainant told the gunman that he did not have any cash.

Appellant, also holding a gun in his hand, ran up to the gunman and asked him if he had retrieved any cash from the complainant. When the gunman told appellant that the complainant did not have any cash, appellant stated, "I feel deceived . . . . I am going to shoot him." Appellant noticed that the complainant was staring at him from this close distance, so appellant covered his face with his t-shirt and told the complainant to stop looking at him. Appellant kept telling the other gunman that he would shoot the complainant and that he did not care.

2

The gunman tried to convince appellant not to shoot the complainant. The gunman looked at the diaper box the complainant had purchased and told appellant, "[N]o, no let's not do it. There's no cash on him. He don't have anything. Let's just go. He is [sic] probably got a kid." The complainant looked at appellant — who was still pointing a gun at the complainant — and offered to let appellant search him. Appellant then searched the complainant. When appellant could not find any cash on the complainant, he kept the complainant's cell phone but threw away the complainant's keys. Appellant instructed the complainant to look down on the ground and threatened to shoot the complainant if he looked up. Appellant and the gunman ran away. The complainant called the police.

The complainant later identified appellant as one of the robbers on a photo spread; the complainant confirmed he was one hundred percent sure appellant robbed him. The complainant also identified appellant at trial, testifying he had "no doubt at all" that appellant robbed him. A jury found appellant guilty of aggravated robbery and assessed his punishment at ten years' confinement.

## Analysis

During voir dire, defense counsel asked the venire, "Let's talk about factors in a section of the sentence in a case of aggravated robbery with a deadly weapon, what factors do y'all think are important?" The trial court then stated, "[Defense counsel], that's a commitment question. You can't ask that question." In the original appeal, this court held that the defense counsel's question was an improper commitment question.

"A commitment question is a question that commits a prospective juror to resolve or to refrain from resolving an issue a certain way after learning of a particular fact." *Id*. at *1. "Commitment questions are impermissible unless the law requires a commitment, and the law does not require a commitment on what factors a juror will consider during sentencing." *Id*. A trial court abuses its discretion if it disallows a proper voir dire question. *Id*.

3

The Court of Criminal Appeals held that defense counsel's question in this case was not a commitment question because it was "an inquiry into the jurors' general philosophies" and "did not ask the jurors how particular facts would influence their deliberations." *Id*. at *2. Accordingly, the court concluded that defense counsel's question was a proper voir dire question.[1] *See id*.

Because the trial court abused its discretion by disallowing defense counsel's proper voir dire question, we must determine whether appellant was harmed by the trial court's error in this case. *See id*.; *Jones v. State*, 264 S.W.3d 26, 27 (Tex. App.— Houston [1st Dist.] 2007, pet. ref'd) (citing *Barajas v. State*, 93 S.W.3d 36, 38-9 (Tex. Crim. App. 2002)). Here, the trial court's error violated the Texas Constitution. *Jones v. State*, 223 S.W.3d 379, 380, 382 (Tex. Crim. App. 2007). Under Texas Rule of Appellate Procedure 44.2(a), a court of appeals must reverse a judgment of conviction or punishment unless it determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* Tex. R. App. P. 44.2(a); *Jones v. State*, 264 S.W.3d 26, 28 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

Therefore, we must determine whether it can be said that, beyond a reasonable doubt, the trial court's refusal to allow defense counsel to question the venire did not contribute to the punishment in this case. In *Rich v. State*, 160 S.W.3d 575, 577-78 (Tex. Crim. App. 2005), the Court of Criminal Appeals set forth general factors that are "relevant considerations in determining the harm from being denied a proper question to the venire": (1) any testimony or physical evidence admitted for the jury's consideration; (2) the nature of the evidence supporting the verdict; (3) the character of the alleged error and how it might be considered in connection with other evidence in the case; (4) the jury

---

[1] In its brief on remand, the State invites us to address a newly raised argument that the trial court acted within its discretion in disallowing defense counsel's question to the venire because the question was ambiguous. The State relies on Presiding Judge Keller's dissent to the Court of Criminal Appeal's majority opinion in this case. *See Davis*, 2011 WL 1135373, at *3 (Keller, J., dissenting) ("the question in this case is ambiguous and subject to being interpreted as an improper commitment question. Because of this ambiguity, I would hold that the trial court did not abuse its discretion in excluding the question."). We decline to address this newly raised argument for the first time on remand.

4

instructions; (5) the State's theory and any defensive theories; (6) closing arguments; (7) voir dire; and (8) whether the State emphasized the error. We turn to these factors.

The court discussed punishment with the venire on two separate occasions during voir dire, including the range of punishment and considering the entire range of punishment. The court specifically described that the offense charged, aggravated robbery, encompasses many potential scenarios; it could encompass a young person with an unloaded weapon who steals to help with medical expenses but causes no injuries or a ruthless individual who stalks an elderly woman and robs and pistol whips her causing permanent injuries. The court then questioned the venire to determine whether each venire member could "consider the full range of punishment for the offense of aggravated robbery" and "probation for the offense of aggravated robbery in the appropriate case." The record provides no indication that the venire members who were seated on the jury were unable to consider the full range of punishment.

Defense counsel also addressed the venire, asking who among the venire members could "never under any circumstances consider probation in an aggravated robbery case." When defense counsel was not allowed to question the venire members about what factors they deemed important in assessing a sentence in an aggravated robbery case, defense counsel moved on and discussed punishment, deterrence, and rehabilitation as "the most important function of a criminal sentence." Defense counsel asked all venire members individually if they considered punishment, deterrence, or rehabilitation to be the most important function of a sentence.[2] Defense counsel then asked no further questions, but alerted the Court to his desire to know whether the existence or absence of injuries to the complainant or the character of the weapon used are important factors in assessing sentence. Thus, the voir dire record alone provides an indication that harm did not flow from the refusal of one question because defense counsel obtained all of the information sought: members' punishment philosophy and their ability to consider the

---

[2] Eight venire members identified "rehabilitation" and four identified "deterrence," and the remaining identified "punishment." Two of the "rehabilitation" respondents were excused by agreement of counsel for cause.

5

full range of punishment for an aggravated robbery that may or may not involve injuries or weapons capable of inflicting injury.

Further, during the guilt-innocence phase of the trial, the jury heard that the complainant identified appellant as one of the robbers on a photo spread and confirmed he was one hundred percent sure appellant robbed him. The complainant also identified appellant at trial, testifying he had "no doubt at all" that appellant robbed him. The jury also heard the complainant testify that appellant was angry and wanted to shoot him when he found out that the complainant did not have any cash. The complainant testified that appellant stated, "I feel deceived . . . . I am going to shoot him." The complainant testified that appellant kept telling the other gunman that he would shoot the complainant and that he did not care. The complainant also testified that the other gunman convinced appellant not to shoot the complainant.

During the punishment phase, the complainant's apartment complex manager, Kimberly Vanover, testified that she observed appellant break into an occupied apartment two weeks earlier. Vanover testified that she tried to call the apartment complex security officer, but appellant "snatched" her phone and ran away with it.

During the punishment phase, appellant asked the jury to consider giving him probation. However, when his trial counsel asked appellant to "tell the jury why they should consider giving" him probation, appellant responded, "Cause I feel it really if I was to go to prison, it wouldn't make my [sic] better. And I feel like when you get convicted of a crime, you suppose to learn from it. . . . But if I was to go to prison, I don't even — I ain't going to learn from it. I am going to [be] more mad than anything."

Appellant also admitted having discipline problems in school; he "was messing up bad . . . was getting into trouble, hanging out with the wrong people." Appellant testified that his school discipline record included: after school detentions, in-school restrictions, and short-term suspensions for disruptive behavior; in-school restriction for breaching his school contract; after school detention for tardiness; in-school restriction for theft; short-term suspension for fighting; warning for harassment of a female student; and long-term

6

suspension for possession of drugs.

Appellant testified that he was suspended for one semester because he was caught with marijuana in school. He testified that he "just use[d] marijuana" every other day but that his mother did not know because he would smoke outside. Appellant testified that he "got caught with a whole bunch of" Xanax pills in school. He also testified that he was expelled from school in January 2008 and sent to an alternative school. Appellant's step-father confirmed that appellant got "in trouble for drugs;" he also testified that appellant had a prior drug conviction.

Appellant showed no remorse for his actions during the punishment phase of his trial. Instead, appellant claimed that the complainant lied when he testified that appellant had pointed a gun at him and had threatened to shoot him. When the State asked appellant, "So, even though they found you guilty, you don't believe that you were guilty; and you are telling them that they were wrong?[,]" appellant replied, "I know I wasn't guilty." Also, in response to the State's question whether appellant agreed that probation would not be appropriate punishment for an aggravated robbery, appellant replied, "If you did the crime, I mean, you shouldn't be afraid to go do the time basically, so."

The jury instruction on punishment included the full range of punishment. It instructed the jury that it could assess confinement at five to 99 years and a $10,000 fine; it also instructed the jury that it could recommend appellant for probation.

Further, the punishment range for an aggravated robbery in this case was five years probation to confinement for 99 years. The jury assessed appellant's punishment at ten years' confinement — the low end of the punishment range.

Based on the record before us, we conclude beyond a reasonable doubt that the trial court's error in refusing to allow the proper voir dire question in this case was harmless and did not contribute to the sentence assessed.

7

## Conclusion

We hold that the trial court's voir dire error, reviewed under the constitutional harm analysis, was harmless. Accordingly, we affirm the trial court's judgment.

/s/     William J. Boyce
        Justice

Panel consists of Justices Brown, Boyce, and McCally.

Publish — Tex. R. App. P. 47.2(b).